LOCAL UNION NO. 494, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, Plaintiff,

v.

BREWERY PROPRIETORS, Pabst Brewing Company, Miller Brewing Company, and Jos. Schlitz Brewing Company, Defendants.

No. 67–C–377.

United States District Court
E. D. Wisconsin.

Sept. 20, 1968.

Kenneth R. Loebel, Milwaukee, Wis., for plaintiff.

Fred G. Groiss, Milwaukee, Wis., for defendants.

## OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

REYNOLDS, District Judge.

### I. *History of Case*

Plaintiff (hereinafter referred to as "Local 494") filed this action on November 13, 1967, under § 301(a) of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 185(a), asking this court to enforce an arbitration award as Local 494 interpreted the award. Defendant Brewery Proprietors counterclaimed for enforcement of the award according to their interpretation thereof. After preliminary motions relating to discovery, cross motions for summary judgment were filed on February 9, 1968, and on March 6, 1968, by Local 494 and the breweries, respectively. Briefs have been submitted by all parties, and oral argument has been heard. The cross motions for summary judgment are now before this court for decision.

### II. *Facts*

The facts in this case are not contested, as evidenced by the cross motions for summary judgment, but they are nonetheless complex and require a somewhat lengthy statement.

Plaintiff, Local 494, is a labor organization within the meaning of the Labor Management Relations Act of 1947, as amended, and in that capacity represents for the purposes of collective bargaining certain employees employed by defendant brewing companies—Pabst, Miller, and Schlitz. Local 494 and the three individual breweries are located and do business within this judicial district. Defendant Brewery Proprietors is an association consisting of defendants Pabst, Miller, and Schlitz; Brewery Proprietors represents and is the agent of defendants Pabst, Miller, and Schlitz, and in that capacity is engaged in interstate commerce.

On or about June 1, 1965, plaintiff and defendants entered into a collective bargaining agreement covering certain employees employed by the defendant breweries. This agreement was by its terms made effective from October 1, 1964 through October 1, 1969. The articles of this contract, which are the subject of this dispute, are: Article III–"Wage Rates—Fringe Benefits" and Article IX—"Grievance and Arbitration Procedure."

In essence, Article IX establishes a grievance procedure which culminates in final and binding arbitration by a tripartite Board of Arbitration. This Board is composed of a union appointee, a company appointee, and an impartial chairman. Article IX expressly states that:

"All grievances, differences, disputes, or claims involving the interpretation or application of the provisions of this contract, arising between the employer and any employees or between the employer and the Union shall be settled and disposed of exclusively in the manner herein provided: * * *."

After detailed provisions dealing with the composition of the Arbitration Board, finality is given the Board's decision in the following language:

" * * * The decision *of a majority of the Board* shall be final and binding upon both parties to this agreement. * * * " (Emphasis added.)

The dispute which has now resulted in litigation before this court arose pursuant to the contract provisions in Article III, which in relevant part reads as follows:

"*WAGE RATES—FRINGE BENEFITS*

"The wage rate in effect at all times and for all work shall be the minimum rate from time to time negotiated and agreed upon in collective bargaining between the Electrical Workers Union No. 494, I.B.E.W., and the Electrical Contractors Association of Milwaukee, reduced by twenty-five (25¢) cents per hour.

\*    \*    \*    \*    \*    \*

"It is the intention of the parties that the present differential in health and welfare coverage, pension, vacation, holiday and shift differential benefits between those contained in this Labor Agreement and those contained in the Electrical Contractors Association of the Milwaukee Labor Agreement be maintained through the term of this Agreement.

"To effectuate the above it is agreed that whenever negotiations between the Electrical Workers Union No. 494 I.B.E.W. and the Electrical Contractors Association of Milwaukee results in an increase in any of the above benefits, the signatories to this Agreement will meet to negotiate equivalent increases in benefits. It is understood that the benefits negotiated do not necessarily have to be in the same area as were negotiated with the Contractors Association. It is further understood that the Employer shall not have to increase benefits for the first five (5¢) cents of value of any increased benefit negotiated between October 1, 1964 and October 1, 1965. \*    \*    \*

"Any dispute under this section is subject to final and binding arbitration under Article IX of this Agreement."

On or about September 13, 1966, plaintiff requested a meeting with defendants for the purpose of negotiating increases in fringe benefits that were allegedly due employees covered by the above contract provisions. Defendants, on or about November 30, 1966, invoked the arbitration provisions of Article IX to resolve the dispute that existed between the parties regarding application of Article III to fringe benefits. The method by which the benefit increase was to be computed appears to have been the crux of the dispute. A hearing was conducted on April 13, 1967, by the duly selected Board of Arbitration, at which plaintiff and defendants appeared with their attorneys and presented evidence in support of their respective positions.

The controversy before this court is what, if any, legal effect is to be accorded the acts of the parties subsequent to this hearing. There is no dispute as to what factually occurred, but there is great disagreement as to the legal effect thereof. Chronologically, the following events occurred.

On or about July 10, 1967, the impartial chairman of the Board of Arbitration sent a document to both the union and the Brewery Proprietors' appointees of the Board. This document was approximately sixteen pages long. It stated the issue presented to the Board and the relevant contract provisions. A lengthy summary of the arguments presented by both sides of the dispute was presented. The merits of the positions advanced were dealt with, as they pertained to specific aspects of the dispute, including the specific topics of "Vacations," "Health and Welfare," and "Holidays." A paragraph denominated "Decision" concluded the document by stating:

"The parties are to negotiate fringe benefit increases in the amount of 6.35 cents per hour, equivalent to the outside increases of August, 1966 and February, 1967."

This document was signed by the impartial chairman and had blank signature lines for each of the other members of the Arbitration Board.

A letter from the impartial chairman accompanied the July 10, 1967, document and stated in relevant part as follows:

"Enclosed is a draft copy of my decision in the Brewery Proprietors arbitration case. If one or both of you sign it, it will constitute the official decision of the Arbitration Board, and I will appreciate your sending duplicated copies of the signed award to the parties and to me. * * * "

On or about July 24, 1967, the union appointee to the Board of Arbitration wrote the impartial chairman and the Brewery Proprietors' appointee of the Board of Arbitration. In this letter he stated that he agreed with the decision of the impartial chairman but believed that an arithmetic error had been made and should be corrected.

On July 27, 1967, the Brewery Proprietors' appointee cabled the impartial chairman, who was then out of the country, and requested that he not issue any final award until he heard further from this company-appointed arbitrator. On August 2, 1967, another cable was sent by the same party to the impartial chairman requesting a meeting of the Board as soon as the chairman returned to the United States. There is no evidence that the union-appointed member of the Arbitration Board knew of these cables at that time.

On August 3, 1967, the union-appointed member of the Board of Arbitration signed the document which the impartial chairman had sent on or about July 10. On the same date he wrote to both the impartial chairman and the company appointee of the Board indicating that he had signed the chairman's document but still believed it contained an arithmetic mistake.

The impartial chairman, on August 5, 1967, wrote both of the other members of the Board of Arbitration and indicated that he had changed his mind and now believed another meeting of the Board was necessary. He stated:

"In view of Mr. Sherman's telegram requesting a meeting of the arbitration board and the absence of agreement on the basis of the preliminary draft decision, I now feel that it is best that we meet again prior to agreement on a final decision."

Another meeting of the impartial chairman, the union appointee, and the Brewery Proprietors' appointee was in fact held on September 19, 1967. After that meeting, on September 28, 1967, the impartial chairman sent a letter to the other members of the Board. The letter stated, somewhat emphatically, that the July 10, 1967, award was final and binding:

"I have now had an opportunity to re-examine the award as well as the earlier evidence and arguments presented in the above-indicated case in the light of the discussions held by the Arbitration Board last week.

"I see no reason to alter the award, dated July 10, 1967. As Mr. Mock has noted, this award has been approved by a majority of the Arbitration Board, and so it is to be considered as final and binding. * * * "

This letter stated, in essence, that the chairman believed the first document was clear and did not need to be changed. He acknowledged, however, that there had apparently been "some misinterpretation of the award." In that context he stated:

" * * * upon re-examining the language, it [the July 10 award] seems clear to me, and I see no reason to alter it. The procedure and measurement formula presented there is fully consistent with the contractual stipulations that the 'present differential * * * be maintained' and that 'whenever negotiation * * * results in an increase in any of the above benefits, the signatories to this Agreement will meet to negotiate equivalent increases in benefits.'

"Since it was determined that the outside employees received the equivalent of 6.35 cents per hour in *increased* fringe benefits, the differential between outside and Brewery employees

can be maintained only if the Brewery employees also receive 6.35 cents per hour in *increased* benefits. This increased 'cost-contribution-benefit' in the Breweries should cover the Brewery employers' *total increased* costs for fringe benefits as of Februarly (sic) 1967, regardless of the differing formula or procedures used for calculation of vacations or other fringe benefits in the Breweries as compared with the outside employers. Only in this way can the differential in benefits be maintained as the contract provides."

The award apparently being still unclear, at least from the view of the attorney for the defendants, on October 16, 1967, an exchange of telegrams occurred between the attorney for the companies and the impartial chairman of the Board of Arbitration. There is no indication that plaintiff joined in this exchange or that it received a copy thereof until a few days later at a subsequent meeting of the parties. The text of these telegrams is set out below.

1. Telegram from attorney for the defendants to the impartial chairman of the Board of Arbitration:

"Re: Arbitration between Milwaukee Brewery Proprietors and I.B.E.W. Local Union No. 494

"So that our record for the future may be complete, would you be good enough to confirm in writing what you told me in our brief telephone conversation this morning as to the proper computation to be made by the employers under your 6.35¢ award —the employers should *not* deduct any credit for the new wage rate for holidays (confirming your original draft award in this respect); but that, in order to maintain the differential, there should be a credit taken by the employers for the new wage rate for vacations. I should much appreciate this confirmation by return telegram tonight."

2. Telegram from impartial chairman of Arbitration Board to attorney for defendants:

"As indicated in the award dated July 10th and letter dated September 28th the total added cost of fringe benifits, (sic) 6.35 cents, should include increased cost and benifits (sic) of vacations arriving from increased wage rates as well as any other increased employer payments for vacations."

III. *Disposition*

In the cross suits to enforce the arbitration award, the first issue presented to this court is whether in fact an award has been issued and, if so, what document or documents constitute the award. In the opinion of this Court, in view of all the facts and circumstances in this case, the document issued by the impartial chairman on July 10, 1967, and signed by the union-appointed arbitrator on or about August 3, 1967, was intended to and does in fact constitute the arbitration award in this case.

As the court said in Bangor and Aroostook R. Co. v. Brotherhood of Loc. F. & E., 258 F.Supp. 346, 348 (D.D.C.1966): "We must construe the Award just as a statute or contract in accordance with the obvious intention of its framers." This principle is just as logically applied to the problem of determining whether a given document is in fact intended to be an arbitration award.

The length and scope of the July 10 document support the inference that it was intended, when signed by another member of the Board, to be the final award. The subsequent letter of September 28, 1967, from the chairman to the other members of the Arbitration Board reinforces the conclusion that the July 10 document was the final award. In that letter the chairman said:

"*I see no reason to alter the award, dated July 10, 1967.* As Mr. Mock has noted, this award has been approved by a majority of the Arbitration Board, and so *it is to be considered as final and binding.*" (Emphasis added.)

Thus, it seems to this court that the obvious intention of the framers was that the document of July 10 be the final award when signed by a majority of the Board. It is clear from the contract itself that only majority agreement, not unanimity, is required of the Arbitration Board.

The fact that the award was final, however, does not necessarily preclude further clarification by the Arbitration Board in the event an ambiguity exists therein. This is so even though an award is to be read in the context of the opinion and findings of the Board of Arbitration. United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); Hanford Atomic Metal Trades Council, etc. v. General Electric Co., 353 F.2d 302 (9th Cir. 1965). Indeed, resubmission for clarification by the arbitrator is the procedure preferred to a trial de novo by the court. Smith v. Union Carbide Corporation, 350 F.2d 258 (6th Cir. 1965).

It appears to this court that the meeting on September 19, 1967, of all the parties who compose the Arbitration Board in this case together with the letter of September 28 from the impartial chairman constitute a resubmission and clarification of the original award. The language of the letter indicates that this was the intent of the chairman, and the affidavit of at least one member of the Board establishes that the majority of the Board was of the same intent. Consequently, as of September 28, 1967, the final award was composed of the award of July 10 together with the letter of September 28 from the impartial chairman.

The sequence of events subsequent to the clarification letter, however, does not in the opinion of this Court constitute an additional resubmission and clarification. In the first place, there was no further meeting of the Arbitration Board as there had been prior to the clarification letter. A telephone conversation between one member of a tripartite arbitration board and an attorney for one of the parties to the dispute is hardly the same thing as a meeting of all the members of an arbitration board. Thus, this Court is unwilling to hold that an exchange of telegrams between the arbitrator and attorney following such conversation constitutes an additional clarification of the award.

Since both plaintiff and defendant have moved for summary judgment enforcing the arbitration award, the question next to be decided is whether the award is clear and enforceable or whether it contains ambiguities which require that it be resubmitted to the Arbitration Board for further clarification.

From the outset, the union-appointed member of the Arbitration Board has maintained that an arithmetic mistake was made in the award. There is no indication in the record before this court that such error was corrected or otherwise resolved.

The defendants, on the other hand, appear to be unclear on the method of computation to be employed in complying with the award of a 6.35 cents per hour increase in fringe benefits. From the documents before this court, it appears that defendants contend that they should be allowed to credit the increased wage cost of holiday and vacation pay against the total increase in fringe benefits they are directed to negotiate. Having carefully reviewed the July 10 award and the subsequent clarification letter of September 28, this Court finds that an ambiguity does exist on this point. Consequently, the procedure approved in United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), will be followed. This dispute will be resubmitted to the Board of Arbitration for clarification of the manner in which holiday pay and vacation pay are to be treated when computing the increase in fringe benefits and for the correction of any arithmetic errors that may exist in the award as it presently is stated.

This court will, however, retain jurisdiction of this case until the parties have the benefit of clarification by the Arbitration Board. At that time, the motions for summary judgment enforcing the award as clarified will be in order and can be disposed of. This method of disposition has been approved by the court in Hanford Atomic Metal Trades Council, etc. v. General Electric Co., 353 F.2d 302 (9th Cir. 1965), and appears to this court to be a reasonable and expeditious way to handle this type of matter.

It is therefore ordered that the Board of Arbitration to which this dispute was originally presented be reconvened within a reasonable time hereafter for the purpose of clarifying its award with regard to the following:

1. The manner in which holiday pay and vacation pay are to be treated when computing the increase awarded in fringe benefits.

2. Any arithmetic errors which may exist in said award.

3. Any other matters that the parties feel need clarification.