United States Court of Appeals,

Fifth Circuit.

Nos. 92-2186, 92-2268.

First Officers Arthur N. ROGERS and Michael J. Baker, Plaintiffs-Appellees,

v.

AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Defendant-Appellant,

v.

CONTINENTAL AIRLINES, INC., Defendant-Appellee.

April 20, 1993.

Appeals from the United States District Court for the Southern District of Texas.

Before REAVLEY, SMITH and EMILIO M. GARZA, Circuit Judges.

REAVLEY, Circuit Judge:

Air Line Pilots Association, International (ALPA) appeals two judgments awarding former Texas International Airlines (TXI) pilots Arthur N. Rogers and Michael J. Baker injunctive relief, back pay and other damages, and attorney's fees, on the grounds that ALPA breached its duty of fair representation owed to Rogers and Baker. ALPA does not contest the finding that it breached its underlying duty, but does dispute the district court's conclusions regarding the consequences of that breach and the various remedies afforded Rogers and Baker. We affirm the district court's judgment in favor of Rogers and Baker, but vacate the award of attorney's fees.

I. BACKGROUND

Rogers and Baker (collectively "Plaintiffs") were two of twelve pilot-candidates hired by TXI on October 13, 1980, during a heated labor dispute with ALPA, the union representing TXI's pilots. Plaintiffs and the others came to be known within and around ALPA as the "dirty dozen" due to perceptions that they were being hired as potential strike replacements should TXI-ALPA relations deteriorate to that point. Plaintiffs completed their FAA-required ground training on or before November 19, 1980, but were unable to complete their flight training because the ALPA-member "check pilots" refused to train them. Plaintiffs were furloughed by TXI effective December 31, 1980.

TXI and ALPA eventually reached a contract agreement, effective July 7, 1981, pursuant to which, *inter alia,* all pilots then on the TXI seniority list were recalled (the "Letter 11 Agreement"). Plaintiffs had never been assigned positions on the seniority list, and thus were not recalled at that time. In September 1981, TXI published a seniority list showing Plaintiffs having seniority as of July 30, 1981, and as having been furloughed on the same date. Plaintiffs were recalled on July 26, 1982, at which point they began their first active service. However, this was not to last. Pursuant to the merger of TXI and Continental Airlines, Inc. (CAL), ALPA, TXI, and CAL signed a "Fence Agreement" which prohibited TXI and CAL from recalling or placing into active status any pilot not in active service as of July 12, 1982. Because Plaintiffs had not been on active service on or before July 12, 1982, they were again furloughed on October 23, 1982, and paid a $14,400 "adjustment" by CAL (the surviving post-merger entity).

Plaintiffs and the two other members of the "dirty dozen" still with CAL at the time of the October 1982 furlough filed grievances under t he ALPA-TXI agreement, which were eventually resolved in binding arbitration by Professor Charles Morris. Morris determined that Plaintiffs should have been given a seniority date of November 19, 1980—the date on which they successfully completed ground training—consistent with TXI policy regarding other pilots. He also found that, had they been given the appropriate seniority date, Plaintiffs would have been recalled to active status in July 1981, when the pilot least senior to the Plaintiffs (J.M. Sims) was recalled, and would have remained on active status until December 1, 1981, when Sims and other pilots more senior to Plaintiffs were furloughed due to the PATCO strike. Morris ordered TXI/CAL and ALPA to (1) change Plaintiffs' seniority dates to November 19, 1980, (2) treat them as having been on active duty "at least since June 24, 1982"—the date on which Sims was recalled from post-PATCO furlough, and (3) provide Plaintiffs back pay, training, assignments, and benefits accordingly (collectively "the Morris Award").

A second arbitration panel, chaired by Marcia Greenbaum, was assigned the task of integrating the TXI and CAL pilot seniority lists. Based upon (1) date of hire, (2) length of active service (excluding furlough time), (3) whether the pilot had a job as of November 25, 1981, and (4)

"furlough vulnerability," the Greenbaum panel established, effective July 31, 1983, nine seniority groups, and placed Plaintiffs, their remaining colleagues, and one pilot hired in July 1982 into Group 9 ("the Greenbaum Award"). The Greenbaum panel intended to issue a more complete opinion, but CAL's bankruptcy and related labor strife caused the panel to delay the release of its supplementary opinion ("Greenbaum Supplement") until March 31, 1986.

Rogers and Baker commenced this action in September 1984, seeking (1) to force ALPA and CAL to adhere to the Morris Award and (2) to recover against ALPA for breach of its duty of fair representation. ALPA attempted to offer the Greenbaum Supplement into the record, but the district court struck it and granted Plaintiffs' motion in limine to prevent mention of the Greenbaum Supplement. By judgment dated August 7, 1989 ("*Rogers II* "), the district court ordered ALPA and CAL to comply with the Morris Award and promote Plaintiffs to the bottom of Group 7, and found that ALPA had breached its duty of fair representation, ordering ALPA to pay monetary damages and costs for both CAL and Plaintiffs. [No. 92-2186] The district court subsequently ordered ALPA to pay Plaintiffs' attorneys' fees. [No. 92-2268] ALPA appeals both orders. CAL does not appeal, but has filed a brief in support of the district court's jurisdiction.

## II. DISCUSSION

ALPA appeals on four grounds: first, the district court lacked jurisdiction to hear Plaintiffs' complaints; second, the district court erred by not admitting the Greenbaum Supplement into evidence; third, the district court erred in concluding that the Greenbaum Award, as implemented by ALPA, violated the rights secured to the Plaintiffs by the prior, binding Morris Award; and fourth, the district court erred in awarding Plaintiffs their attorney's fees.

A. JURISDICTIONAL ISSUES.

ALPA argues that the district court lacked jurisdiction over Plaintiffs' complaints because an identical action was already pending before the Civil Aeronautics Board ("CAB") when this case was commenced. ALPA originally based its jurisdictional challenge on (1) CAB's exclusive jurisdiction

over airline mergers and pilot seniority list integration,[1] (2) Plaintiffs' failure to exhaust their administrative remedies before the CAB, and (3) primary jurisdiction. The district court denied ALPA's motion to dismiss on these grounds, concluding that the focus of Plaintiffs' complaint was ALPA's breach of its duty of fair representation, and that the district court had concurrent jurisdiction over such a complaint. *Rogers v. Airline Pilots Ass'n Int'l,* 647 F.Supp. 195, 196-97 (S.D.Tex.1985) ("*Rogers I* "). ALPA now contends that (1) the authority relied upon by the district court is distinguishable from the present case, (2) the Department of Transportation ("DOT"), the successor to CAB *viz.* airline mergers, issued an opinion inconsistent with that of the district court *prior to* the district court's opinion, and (3) in order to uphold the district court, this court would have to contradict the D.C. Circuit's *ALPA v. DOT* decision.

*1. Exclusive or Concurrent Jurisdiction?*

This circuit has not determined whether an airline employee who has already invoked the jurisdiction of CAB/DOT regarding seniority integration may also bring a separate duty-of-fair-representation action in federal court. Nor has any other circuit addressed the precise question at hand. *Compare Cook v. Pan American World Airways, Inc.,* 771 F.2d 635, 645-46 (2d Cir.1985), *cert. denied,* 474 U.S. 1109, 106 S.Ct. 895, 88 L.Ed.2d 929 (1986) *and Carey v. O'Donnell,* 506 F.2d 107, 110-11 (D.C.Cir.1974), *cert. denied,* 419 U.S. 1110, 95 S.Ct. 783, 42 L.Ed.2d 806 (1975)[2] *and Kesinger v. Universal Airlines, Inc.,* 474 F.2d 1127, 1131-32 (6th Cir.1973) *and Oling v. Air Line Pilots Ass'n,* 346 F.2d 270, 275-76 (7th Cir.), *cert. denied,* 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965) (all denying the district court jurisdiction over

---

[1]CAB's role in airline mergers was eliminated effective January 1, 1985, and all of its merger authority was transferred to DOT. DOT's authority over airline mergers expired January 1, 1989, pursuant to Pub.L. No. 98-443, § 3(c), 98 Stat. 1703 (1984). *See Air Line Pilots Ass'n Int'l v. Department of Transp.,* 880 F.2d 491, 493 n. 1 (D.C.Cir.1989) ("*ALPA v. DOT* ").

[2]Interestingly, in its 1988 decision in the parallel appeal to this case, the D.C. Circuit characterized *Carey* as "holding" that CAB had exclusive jurisdiction over all "matters of airline merger, including the fair and equitable integration of seniority lists, ... subject *only* to review in the courts of appeals." *ALPA v. DOT,* 880 F.2d at 499 (quoting *Carey,* 506 F.2d at 110) (emphasis in original). However, *Carey* was solely concerned with whether the district court had jurisdiction to hear a collateral attack on a final order of the CAB, not with whether a complaint could have been originally raised in the district court *instead of,* or at the same time as, the CAB.

duty-of-fair-representation actions filed after the CAB had issued a final order regarding that issue) *with Clayton v. Republic Airlines, Inc.,* 716 F.2d 729, 732 (9th Cir.1983) (finding that the district court had jurisdiction to hear duty-of-fair-representation claim where the CAB had not ruled on the issue). Here, Plaintiffs sought CAB review, but filed suit in federal court before the CAB had ruled.

Plaintiffs, CAL, and the district court distinguish the cases denying jurisdiction based upon final CAB/DOT adjudication as, essentially, bars on collateral attacks on the final judgment of a body with concurrent jurisdiction with that of the district court. We agree, particularly in light of *Clayton, supra.*

In finding that the district court's jurisdiction was concurrent with CAB/DOT's, the Ninth Circuit limited *Oling, Carey,* and *Kesinger* as barring collateral attacks on final CAB orders, and relied on the Eighth Circuit's holding in *Augspurger v. Brotherhood of Locomotive Engineers,* 510 F.2d 853, 858 (8th Cir.1975), that the district court had jurisdiction to hear a duty-of-fair-representation claim despite the authority granted to the Interstate Commerce Commission over railroad mergers. *Clayton,* 716 F.2d at 730-31.[3]  The Ninth Circuit concluded:

> As important as these [factors which weigh in favor of exclusive jurisdiction of the CAB] are, there are competing and more important concerns embodied in the duty-of-fair-representation cause of action. There is nothing in the wording of the [Federal Aviation Act] or in its legislative history to indicate that Congress intended to remove from the courts their power to hear this action. The duty of fair representation is judicially created: "It is a right primarily and jealously guarded by the judiciary."

*Id.* at 731 (quoting *Augspurger,* 510 F.2d at 857) (citations omitted).

*2. Effects of Prior Related Judgments.*

ALPA also argues that the district court erred by entering a judgment inconsistent with a prior CAB/DOT judgment. ALPA contends the district court's continued consideration of Plaintiffs' claims became a "collateral attack" on the CAB order. ALPA does not seek to apply the CAB order for

---

[3]The district court in this case took a similar tack, relying upon earlier decisions of this court holding that the district courts had jurisdiction to hear duty-of-fair-representation claims notwithstanding the jurisdiction of the National Labor Relations Board. *Rogers I,* 647 F.Supp. at 196-97 (citing and discussing *Mumford v. Glover,* 503 F.2d 878, 883 (5th Cir.1974), and *Smith v. Local No. 25, Sheet Metal Workers Int'l Ass'n,* 500 F.2d 741, 747 (5th Cir.1974)). However, like *Clayton,* neither *Mumford* nor *Smith* involved simultaneous agency review and federal court litigation.

issue or claim preclusion purposes. As for the "collateral attack" argument, the cases cited by ALPA are still distinguishable because the federal court claims in those cases were all filed after the CAB order was issued and either confirmed on appeal or allowed to become final by passage of time. Here the suit was filed within a week of the commencement of CAB review, and may well have been disposed of prior to the CAB order but for the need for Judge MacDonald to recuse herself after argument.

As for the potential conflict with the D.C. Circuit's decision, that court refused to issue an injunction in favor of ALPA to stay the ongoing proceedings in the Southern District of Texas because it was unwilling to impose exclusive jurisdiction upon the jurisprudence of this circuit. *ALPA v. DOT,* 880 F.2d at 502-04. The D.C. Circuit held that DOT had insufficient evidence before it to order further arbitration, so the court remanded to DOT, fully aware that "on remand DOT may very well rely on th[e] findings" of the district court in this case. *Id.* at 499. There has, in fact, been no final DOT order following the remand. Thus, there is no conflict with the D.C. Circuit as to jurisdiction. And, while we ultimately decide that the district court, not the D.C. Circuit, was correct as to the proper placement of Plaintiffs in the integrated seniority list, this is no basis for finding a jurisdictional defect.

B. EVIDENTIARY ISSUE.

ALPA argues that the district court erred by not admitting the Greenbaum Supplement into evidence. This court will reverse an evidentiary ruling only when the district court has abused its discretion. *Rock v. Huffco Gas & Oil Co.,* 922 F.2d 272, 277 (5th Cir.1991). In a bench trial, such as this case, the district court has more leeway in evaluating the admissibility of evidence since it is both the arbiter of admissibility and the finder of fact. Here the district court determined that the passage of time and the potential that ALPA would exercise undue influence over the Greenbaum Supplement—prepared by ALPA "insiders" at ALPA's behest—outweighed any potential guidance the Supplement would offer the court in reading and understanding the Greenbaum Award, especially when the Award itself was before the court in its final form without considering the Supplement at

all. We do not find that the district court abused its discretion in reaching this conclusion.[4]

C. THE DISTRICT COURT'S SUBSTANTIVE HOLDING.

In its briefs to this court, ALPA concedes the district court's finding that ALPA breached its

---

[4]Nor do we find the dissent's argument compelling, relying as it does on *Iron Workers Local No. 272 v. Bowen,* 624 F.2d 1255 (5th Cir.1980). The dissent argues that *Bowen* 's holding "that there was no need to remand an award to the arbitrator because the arbitrator had already clarified the award by writing a supplementary opinion at the request of the prevailing party" supports ALPA's position that we should "interpret[ ] the original award based upon a supplementary opinion requested by a party to the arbitration"—namely, ALPA. *Infra* at 3629 n. 1.

We think the dissent overstates its case. In the first place, the *Bowen* court was determining whether the district court had erred by admitting the arbitrator's supplementary opinion, not whether the district court erred in not doing so. Finding no abuse of discretion in deciding to admit a certain kind of evidence does not necessarily imply that not admitting that kind of evidence, especially in a different case, *is* an abuse of discretion.

Furthermore, *Bowen* holds that deciding whether an arbitrator's supplementary "clarification" of a prior decision "went beyond the scope of the issues" is a task for the district court. *Bowen,* 624 F.2d at 1264 (citation omitted). Surely, then, deciding whether to admit an additional "explanation" of an unambiguous award is also a task for the district court.

Finally, the district court's order granting Plaintiffs' motion in limine to exclude the Greenbaum Supplement does not "improperly rel[y]" upon *Bowen* and *San Antonio Newspaper Guild Local No. 25 v. San Antonio Light Div.,* 481 F.2d 821 (5th Cir.1973) to support exclusion of the Greenbaum Supplement, as the dissent implies. *See infra* at 3629 n. 1. Quite the contrary, the district court correctly cites both cases as "recogniz[ing] that there may on occasion be a need for an arbitrator to clarify an award," especially "where differing interpretations frustrate the implementation of an arbitration award." What the district court concluded, however, was that this was not such a case:

> The purpose of the arbitration that is the subject of the instant action was to integrate the pilot seniority lists of Continental Airlines and Texas International Airlines. This was accomplished by the July 25, 1983 award. Arbitration Chairperson Greenbaum believed the award to be clear and unambiguous. Similarly, Continental had no difficulty implementing the integrated seniority list and continues using it today, albeit in a form modified by bankruptcy proceedings. The integrated seniority list issued on July 25, 1983 resolved the dispute before the ALPA Arbitration Board.

The original Greenbaum Award having so resolved the dispute in a manner which was "clear and unambiguous" and which enabled CAL to implement the integrated seniority list, the district court concluded, as was clearly within its purview, that this was not a case like *San Antonio Newspaper Guild* where clarification was needed because differing interpretations frustrated the implementation of the Greenbaum Award. *See San Antonio Newspaper Guild,* 481 F.2d at 824-25.

duty of fair representation owed to Plaintiffs[5] and does not dispute the district court's findings as to Plaintiffs damages, assuming that the district court properly determined that Plaintiffs were, in fact, harmed by ALPA's actions. Instead, ALPA tries to frame the entire dispute in terms of the district court's interpretation of the Morris and Greenbaum Awards. A full understanding of these two awards supports the district court's, not ALPA's, position.

1. *Plaintiffs' Employment and Seniority Status as of June 18, 1983.*

Plaintiffs were hired by TXI on October 13, 1980. They completed their ground training on or before November 19, 1980, and were immediately furloughed. ALPA did not place Plaintiffs on the TXI seniority list until, effectively, July 30, 1981. Plaintiffs remained on furlough through the PATCO strike and were finally recalled (actually, first "called") to active service on July 26, 1982, but were again furloughed on October 23, 1982, pursuant to the terms of the Fence Agreement, and were still on furlough when Professor Morris issued his findings in June 1983. Thus, as of June 18, 1983, Plaintiffs were on furlough and credited with less than 23 months of seniority and less than 3 months of active service.

If Plaintiffs had initially received the treatment mandated by the Morris Award, they would have been placed on the seniority list on November 19, 1980. As a result, they would have been recalled to active service in July 1981, as were J.M. Sims and other more senior pilots, pursuant to the Letter 11 Agreement.[6] They would then have been furloughed, along with Sims and others, on December 1, 1981, and recalled to active service on or before June 24, 1982. Under the terms of the

_____

[5]ALPA doesn't agree with the district court's findings in that regard, but accepts that they are factual findings which will not be upset by this court.

[6]The Letter 11 Agreement provides, in relevant part that

> All pilots who were on furlough status on [July 7, 1981] shall immediately be recalled as pilots. Pilots on the seniority list on [July 7, 1981] shall not be furloughed or downgraded for the duration of the contract, nor suffer any diminution of pay, except as a direct result of economic conditions beyond the control of [TXI], ... [or] strikes....

> While, at first blush, it would appear that Plaintiffs should have been immediately recalled with or without the Morris Award, we must recall that, as of July 7, 1981, Plaintiffs were not even on TXI's seniority list, and thus the airline might not have known that they were on furlough status.

Fence Agreement, had Plaintiffs been in active service no later than July 12, 1982, they would not have been furloughed as they were in October 1982, but would have continued in active service through *at least* June 18, 1983. Thus, had the Morris Award been properly implemented, as of June 18, 1983, Plaintiffs would have been on active status, would have been credited with 31 months of seniority, and would have served at least 17 months on active status.

Notwithstanding the subsequent effects of the Greenbaum Award, ALPA's treatment of the Plaintiffs, in terms of seniority and active status, was substantially different from the way Professor Morris found ALPA should have treated the Plaintiffs.

*2. The Morris Award and the Greenbaum Award.*

Turning now to the awards, ALPA argues that, contrary to the apparent conclusion of the district court, the Morris and Greenbaum Awards are not inconsistent—that is, the Greenbaum panel correctly placed Plaintiffs in Group 9—and that any detrimental consequences of that placement would have occurred with or without the Morris Award. We disagree.

The Greenbaum Award placed J.M. Sims, the pilot least senior to the Plaintiffs, in Group 7, while Plaintiffs were placed in Group 9. ALPA would have us believe that this was due to clear differences in Sims's and Plaintiffs' (1) date of hire, (2) length of active service, (3) employment status as of November 25, 1981, and (4) furlough vulnerability.

Based upon the information considered by the Greenbaum panel, this is a defensible position. Sims's date of hire, along with five other Group 7 pilots, was December 10, 1979. His seniority date, according to the September 1, 1981 TXI Flight Operations Manual, is January 14, 1980, meaning that he would have been eligible to begin active service at that time. We know that Sims was recalled from furlough in July 1981 and that he continued active service until the PATCO furlough effective December 1, 1981. We also know that Plaintiffs were "recruited shortly after TXI furloughed some of its pilots." *Rogers II,* at 3. Given his seniority, we must assume that Sims was one of those pilots furloughed sometime prior to October 13, 1980. Therefore, as of November 25, 1981, Sims would have (1) been hired in December 1979, (2) had 13-1/2 months or less of active service, (3) been currently on active service, and (4) been subject to any future furlough as one of the five least senior

former TXI pilots.

By comparison, in the absence of the Morris Award, as of November 25, 1981, Plaintiffs would have (1) been hired in October 1980, (2) had no active service, (3) been currently on furlough, and (4) been subject to continuing furlough as the least senior TXI pilots. Clearly, in the absence of the Morris Award, the Greenbaum panel was just ified in differentiating between Sims and the Plaintiffs on the basis of active service and current employment status.

However, had the Plaintiffs been treated as the Morris Award required them to be, as of November 25, 1981, Plaintiffs would have (1) been hired in October 1980, (2) had roughly 4-1/2 months active service, (3) been currently in active service, and (4) been only marginally more "furlough vulnerable" than Sims. Now the distinction between Sims and the Plaintiffs becomes much less compelling. True, Sims's hire date was some 10 months before Plaintiffs', but the two (former pre-merger CAL) pilots immediately above Sims in Group 7 were hired in February 1978, as was the most senior former TXI pilot in Group 7, some 21 months before Sims, and the most senior pilot in Group 7 was hired in January 1977. Surely, then, the less-than-one-year difference in date of hire could not be dispositive of Sims's placement in Group 7 and Plaintiffs' placement in Group 9.

With the Morris Award in place, there is no discernible difference between Sims's and the Plaintiffs' current employment status and "furlough vulnerability." Furthermore, since Plaintiffs were currently in active service, they should have been allowed to "leapfrog" all of Group 8, none of whom was in active service as of November 25, 1981, and all of whom were more "furlough vulnerable" than Plaintiffs as a result. Therefore, if the Greenbaum Award were held to be consistent with the Morris Award, we would be required to find that the difference between Sims's 13-1/2 months or less of active service and Plaintiffs' 4-1/2 months of (constructive) active service was significant enough to separate Plaintiffs from Group 7 and to interpose another 400 pilots who were already on furlough as of the Greenbaum panel's self-imposed cut-off date.[7] We cannot accept this conclusion.

_____

[7]The dissent points out that "[s]ection 20(E) of the TXI Seniority Agreement provides that a pilot is on probation until he has completed at least twelve months of active service"; and, therefore, "the nine months' difference in active service between plaintiffs and Sims [,although] a small difference in magnitude, ... is a large difference in-kind." *Infra* at 3631. While we agree that the TXI Seniority Agreement would afford Plaintiffs and Sims different status, we find no

*3. The Effect of the July 26, 1982 "Fence Agreement."*

Had the Plaintiffs been assigned the proper seniority dates and placed in active service as the Morris Award determined they should have been, they would have been in active service from July 1981 until the PATCO furlough in December 1981, and would have been recalled to active service no later than June 1982.[8]  If that had happened, then Plaintiffs would not have been furloughed on October 23, 1982, due to the terms of the Fence Agreement:

> The parties further agree that neither Company may, during the term of this Letter of Agreement, recall or place into active pilot status any pilot not in active line pilot service as of July 12, 1982....

If they had not been furloughed in October 1982, Plaintiffs would have "brought jobs to the merger," and would have accumulated more active service but for ALPA's improper handling of their initial seniority assignment and their placement, via the Greenbaum Award, on the integrated seniority list.

D. ATTORNEY'S FEES.

Under the "American rule" successful litigants are generally not entitled to recover attorney's fees from the losing party, *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975), except where (1) the losing party is found to have pursued the litigation in bad faith, (2) the fee award would spread the cost of the lawsuit among members of a class who benefited from the litigation, or (3) the fees are a proper element of damages.[9]

---

evidence in the Greenbaum Award that suggests that probationary status, or lack thereof, figured into the calculations.  Furthermore, we feel the dissent continues to overlook, as does ALPA, the difference the Morris Award makes regarding Plaintiffs' active service status as of November 25, 1981, thereby making them less "furlough vulnerable" than hundreds of furloughed pre-merger CAL pilots and enabling them to "bring jobs to the merger."  The Greenbaum panel clearly indicated that these were important considerations in integrating the seniority lists—a contention which is evidence by the fact that several active pre-merger TXI pilots (notably Sims and his cohorts in the "lower" part of Group 7) were placed ahead of much more senior pre-merger CAL pilots who were not active (i.e., were on furlough) as of November 25, 1981.

[8]Professor Morris found that Plaintiffs would have been recalled following the PATCO strike no later than June 24, 1982.  The district court, on the other hand, found that their recall date would have been June 9, 1982, the same date that Sims was recalled.  Either way, the recall should have occurred in June 1982.

[9]Another exception is where the fees are authorized by statute.  However, Plaintiffs do not challenge ALPA's argument that the Railway Labor Act does not support a fee award in this case.

We review the attorney's fees award for abuse of discretion. *Atlantic Richfield Co. v. Manges,* 702 F.2d 85, 87 (5th Cir.1983). Finding that the district court's award of attorney's fees fails to fit within any of the recognized exceptions, we hold that the district court abused its discretion in awarding Rogers and Baker their attorney's fees, and therefore vacate that portion of the district court's judgment.

*1. The "Bad Faith" Exception.*

Attorney's fees may be awarded to a successful litigant when his opponent has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974). While other circuits have held that underlying conduct may be considered in determining whether the losing party has acted in "bad faith,"[10] this circuit has consistently held that the "bad faith" action(s) must occur in the course of the litigation. *See Guidry v. International Union of Operating Eng'rs, Local 406,* 882 F.2d 929, 944 (5th Cir.1989) ("[T]he focus of the bad faith inquiry is not the actions that precipitated the law suit, but rather the manner in which the litigation itself is carried out."), *vacated on other grounds,* 494 U.S. 1022, 110 S.Ct. 1465, 108 L.Ed.2d 603 (1990); *Huddleston v. Herman & MacLean,* 640 F.2d 534, 559 (5th Cir.1981) ("[T]he bad faith or vexatious conduct inherent in the fraudulent acts that constituted the cause of action itself cannot be the basis for an attorney's fees award under the bad faith exception. The bad faith conduct must occur during the litigation process itself.") (citations omitted), *aff'd in part and rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

Here the district court found that ALPA had breached its duty of fair representation by acting arbitrarily, discriminatorily, and/or in bad faith toward Plaintiffs "both during and subsequent to seniority integration proceedings," but made no particularized finding of bad faith during the litigation process. Therefore, we hold that the "bad faith" exception does not authorize awarding attorney's

---

[10]*See, e.g., Richardson v. Communications Workers of America, AFL-CIO,* 530 F.2d 126, 133 (8th Cir.) (finding "ample support for a finding of bad faith" sufficient to justify the award of attorney's fees where union "fail[ed] to represent plaintiff in his grievance" and "actually induc[ed] his wrongful discharge"), *cert. denied,* 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976).

fees to Plaintiffs in this action.

*2. The "Common Benefit" Exception.*

Attorney's fees may also be awarded to a successful litigant whose success confers "a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them." *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 393-94, 90 S.Ct. 616, 626, 24 L.Ed.2d 593 (1970).

Plaintiffs claim that their suit would have been to the benefit of the entire "dirty dozen" and anyone else so situated, but by the time the Morris Award was handed down only four such persons existed, including Plaintiffs, and by the time this suit was filed, apparently only Rogers and Baker remained. A class of two, where both are named parties and both immediately benefit as a result of the verdict and shared the cost of obtaining it, is not a "class" for "common benefit" purposes. Furthermore, the award to Plaintiffs does not "inure to the benefit of all union members." *Guidry,* 882 F.2d at 944. In fact, Plaintiffs' success, based upon the rhetoric in the briefs, is probably considered a defeat by much of the union membership.

*3. Attorney's Fees as an Element of Damages.*

In *Seymour v. Olin Corp.,* 666 F.2d 202 (5th Cir.1982), this court upheld an award of attorney's fees and costs against the plaintiff's union as "a fair measure of the "difficulty and expense' " of regaining his proper position with his employer and collecting all of the back pay and benefits owed him resulting from the union's failure to process his grievance. *Id.* at 213-14. However, in *Del Casal v. Eastern Airlines, Inc.,* 634 F.2d 295 (5th Cir.), *cert. denied,* 454 U.S. 892, 102 S.Ct. 386, 70 L.Ed.2d 206 (1981), this court limited the plaintiff's recovery from the union to fees and costs associated with his grievance against his employer, thereby excluding fees and costs associated with his suit against the union for breach of the duty of fair representation. *See id.* at 301.

This case is distinguishable from *Seymour* in that Plaintiffs did not incur the attorney's fees they seek to recover in the course of handling a dispute with their employer which was properly ALPA's duty to pursue; rather, like that portion of the fees which were denied in *Del Casal,* the fees

which Plaintiffs seek herein were incurred exclusively in the pursuit of their action against ALPA for breaching its duty of fair representation.

### III. CONCLUSION

*Clayton, Augspurger, Mumford,* and *Smith* offer this court sufficient guidance to find that the district court did have jurisdiction to hear Plaintiffs' duty-of-fair-representation claim while a contemporaneous action was pending before the CAB. We find no error in the district court's conclusions that the Greenbaum Award failed to properly incorporate the Morris Award and Plaintiffs suffered additional injury due to their improper assignment to the integrated seniority list. Therefore, we AFFIRM the district court's judgment in all respects except for the award of attorney's fees ($184,412.50 plus interest) which we VACATE.

AFFIRMED IN PART, VACATED IN PART.


JERRY E. SMITH, Circuit Judge, dissenting:

Although I agree with some of the majority's reasoning, I must respectfully dissent. I join in the majority's well-reasoned conclusion that the district court had jurisdiction in this case. As I will explain below, however, I disagree with the majority on the merits of the case. I would reverse and remand for a new trial.

### I.

I disagree with the majority's conclusion that the district court properly excluded the Greenbaum Supplement. ALPA tried to offer the "Greenbaum Supplement" at trial. The original Greenbaum panel opinion stated the following:

> The record in this case is voluminous. It contains some 7441 transcript pages, 9 joint exhibits, and thousands of exhibits submitted by both parties. To include pertinent information contained therein in a full Arbitration Opinion and Award, including the Facts and Arguments, will take several months to prepare and document. This, in our view, will unnecessarily delay the issuance of the integrated seniority list. Accordingly, it is the best judgement of this Board that a list should be issued contemporaneously with this Opinion and Award, with full explanation, including facts, arguments and findings to follow as soon as possible.

Shortly after the Greenbaum panel issued its original opinion, however, Continental filed for protection under chapter 11 of the Bankruptcy Code; this filing eventually led to a pilot's strike. The

Greenbaum panel decided not to waste its time preparing a detailed opinion, as that opinion may not have had any relevance, depending upon the outcome of the chapter 11 proceedings.

In preparation for this litigation, ALPA asked the Greenbaum panel to issue a supplementary opinion to explain why it had placed plaintiffs in Group 9. The panel issued the Greenbaum Supplement to make this explanation. The district court ruled that the Supplement was inadmissible.[1]

Plaintiffs stress the procedural irregularities surrounding the preparation of the supplementary opinion, especially the fact that ALPA paid the arbitrators and had the opinion prepared for use in litigation. These arguments, rather than addressing the admissibility of the evidence, concern the weight that the district court should attach to it. Moreover, contrary to the majority's reasoning, the district court did not rely upon these factors in excluding the evidence. Because the district court offered an improper legal basis for excluding the evidence, I believe the court erred in failing to consider the Greenbaum Supplement. Because the Greenbaum panel's reasons for placing plaintiffs in Group 9 is the critical issue in this appeal, this error was not harmless. A reasonable judge could reach a different conclusion on the merits based upon the contents of the Greenbaum Supplement. I would reverse and remand the case for a new trial.

II.

Even if the district court had not erred by excluding the Greenbaum Supplement, I would still reverse based upon the evidence in the record. Plaintiffs, as the district court found, claim that

---

[1]The district court improperly relied upon our decisions in *Iron Workers v. Bowen,* 624 F.2d 1255 (5th Cir.1980), and *San Antonio Newspaper Guild v. San Antonio Light Div.,* 481 F.2d 821 (5th Cir.1973). Those cases addressed the question of when the losing party in an arbitration may force a remand to the arbitrator for clarification of the decision; they do not address the question of when a supplementary opinion is admissible. Indeed, in *Bowen* we held that there was no need to remand an award to the arbitrator because the arbitrator had already clarified the award by writing a supplementary opinion at the request of the prevailing party. This case, then, supports ALPA's position, as we interpreted the original award based upon a supplementary opinion requested by a party to the arbitration.

I find equally questionable the majority's and the district court's conclusion that the award was "clear and unambiguous." True, Continental had no difficulty implementing the list. Of course, implementing the list only requires reading it. The issue here is the *reasoning* used in making the list. As the majority does not quote any of the Greenbaum panel's reasoning in its discussion of the merits, the reasoning is not so "clear and unambiguous."

ALPA's breach of duty resulted in the Greenbaum panel's failure to comply with the Morris Award, resulting in their improper placement in Group 9. As plaintiffs frame the issue, "Quite simply, the district court found ALPA breached its duty of fair representation to Plaintiffs when it failed to comply with and enforce the Morris Award in connection with the TXI-CAL Seniority Integration Proceedings. That alone is what this case is about." Because I find the district court's findings regarding compliance to be clearly erroneous, I would reverse the decision of the district court even if that court properly excluded the Greenbaum Supplement.

To determine whether the Greenbaum panel complied with the Morris Award, one need only look to the Greenbaum Award's description of plaintiffs. On page 36 of that award, the panel describes Group 9 as follows: "Relatively recent TXI new hires with DOH in 1980 or later and LOS of less than four months as of 11/25/81."[2] Given this description, one must examine only two pieces of information to determine whether the Greenbaum Award complied with the Morris Award: date of hire and length of service.[3]

The Morris Award found that the plaintiffs would have had a seniority date of November 19, 1980—the date on which plaintiffs completed their ground training. According to the TXI seniority agreement, a pilot is not considered to be employed by the company as a pilot until he has completed his ground training. As a result, the pilot's date of hire and seniority date are identical. The Greenbaum panel used the November 19, 1980, date as plaintiffs' date of hire as required by the Morris Award.

Turning to the second piece of information, length of service, the Greenbaum panel complied

---

[2]The only further potentially relevant reference to Group 9 appears on page 45 of the opinion, where the panel states, "Finally, we note that notwithstanding this, these CAL furloughees have an earlier DOH and substantial LOS relative to the five TXI Pilots in Group 9, who are fairly recent new hires with little LOS to 11/25/81. Accordingly, they comprise the last group." This language is obviously consistent with the description of Group 9 quoted in the text.

[3]The majority provides analysis regarding two other pieces of information considered by the Greenbaum panel—furlough vulnerability and employment status as of November 25, 1981. ALPA's brief also raises these factors in attempting to justify the Greenbaum Award. I find these factors irrelevant to the issue before us. The majority cannot identify any language in the Greenbaum Award that discusses these factors for Group 9, nor any language which indicates that these factors had anything to do with placing plaintiffs in Group 9.

with the Morris Award for this factor, as well. The Morris Award held that the plaintiffs would have been furloughed until July 30, 1981, at which point they would have been recalled to active service and remained active until the critical date that the Greenbaum panel used to determine length of service, November 25, 1981. Under the Morris Award, plaintiffs would have worked 2 days in July, 31 in August, 30 in September, 31 in October, and 25 in November, for a total of 119 days—a little less than four months. The Greenbaum Panel's description of length of service for Group 9 is therefore consistent with the Morris Award.

The majority admits that plaintiffs would have had no active service in the absence of the Morris Award. Because the Greenbaum Award correctly refers to plaintiffs as having approximately four months of active service, I find that admission hard to reconcile with the majority's later conclusion that the two awards are inconsistent. Had the Greenbaum panel chosen to ignore the Morris award, it would not have chosen the four month figure when describing Group 9.

The compatibility of the Greenbaum Panel's statistics with the Morris Award provides a sufficient reason to reverse the decision of the district court. The majority not only disputes the facial compatibility of the awards, however, but takes the additional step of deciding whether the "Greenbaum panel was justified in differentiating between Sims and the Plaintiffs." The majority appears to substitute its judgment for that of the Greenbaum panel. While giving little consideration to the facial compatibility of the two awards, the majority focuses on where it believes plaintiffs should have been placed in the seniority list. In other words, the majority concentrates on the Greenbaum panel's use of plaintiff's employment statistics, rather than on the accuracy of those statistics.

Even if I were to agree that the proper focus was on the qualitative judgments made by the Greenbaum panel, I still would disagree with the majority. The majority focuses on the one year difference in date of hire and concludes that such a small difference could not be significant. Group 2 contains pilots who were hired within six months of pilots in Group 4. Apparently, a small difference in date of hire is significant, when combined with the other factors the panel considered.

Turning to length of active service, the majority concludes that plaintiffs' four months of

service is not significant when compared to Sims' thirteen months. I disagree. Section 20(E) of the TXI Seniority Agreement provides that a pilot is on probation until he has completed at least twelve months of active service. Although the nine months' difference in active service between plaintiffs and Sims is a small difference in magnitude, it is a large difference in-kind. The Morris Award recognized the importance of the probationary period, as page 31, paragraph 5 of that award retains plaintiffs' probationary status until they complete one year of actual, as opposed to constructive, active service.

Accordingly, the Greenbaum Award is consistent with the Morris Award, and the Greenbaum panel had a good reason for placing plaintiffs in Group 9—their probationary status. Concluding that the majority erred in this regard, I respectfully dissent.